**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| REVEREND CEDRIC V. ALEXANDER, Bowie, Prince George's County, Maryland, on his own behalf and on behalf of a class of similarly situated individuals, | |
| | Civil Action No.: _____ |
| Plaintiffs, | |
| | **COMPLAINT FOR VIOLATIONS OF ERISA AND STATE LAW** |
| vs. | |
| DR. JEROME V. HARRIS 280 Hernando Street, Memphis, TN 38101 | **CLASS ACTION** |
| BISHOP SAMUEL L. GREEN, SR. 110 Pisgah Church Rd., Columbia, SC 29203 | **JURY TRIAL DEMANDED AS TO STATE LAW CLAIMS** |
| TRUSTEES OF THE AFRICAN METHODIST EPISCOPAL CHURCH MINISTERIAL RETIREMENT ANNUITY PLAN, (See address below) | |
| AFRICAN METHODIST EPISCOPAL CHURCH MINISTERIAL RETIREMENT ANNUITY PLAN, (See address below) | |
| AFRICAN METHODIST EPISCOPAL CHURCH DEPARTMENT OF RETIREMENT SERVICES, (See address below) | |
| AFRICAN METHODIST EPISCOPAL CHURCH, INC., (See address below) | |
| GENERAL BOARD OF THE AFRICAN METHODIST EPISCOPAL CHURCH, and (See address below) | |
| COUNCIL OF BISHOPS OF THE AFRICAN METHODIST EPISCOPAL CHURCH 500 Eighth Avenue South Nashville, TN 37203 | |
| and | |
| JOHN AND JANE DOES 1-20, inclusive, | |
| Defendants. | |

Plaintiff Reverend Cedric V. Alexander files this complaint, on his own behalf and on behalf of a class of similarly situated individuals, by and through his undersigned attorneys, and alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is a class action brought by Reverend Cedric V. Alexander ("Rev. Alexander" or "Plaintiff") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and, in the alternative, Tennessee state and common law, as a representative on behalf of thousands of current and former clergy and other employees of the African Methodist Episcopal Church, Inc., a Pennsylvania Corporation ("AMEC," or "the Church"). This class action is brought by a retiree who spent decades of his life in service to the Church against the former Executive Director of the Department of Retirement Services, Dr. Jerome V. Harris, the former Chair of the Department of Retirement Services, Bishop Samuel L. Green, Sr., the Trustees of the African Methodist Episcopal Church Ministerial Retirement Annuity Plan (the "Plan Trustees"), the African Methodist Episcopal Church Ministerial Retirement Annuity Plan (the "Plan"), the Department of Retirement Services (the "Department"), AMEC, the General Board of AMEC, the Council of Bishops of AMEC, and John and Jane Does 1-20, inclusive (collectively, "Defendants"), related to the mismanagement of the Church's retirement plan and loss of tens of millions of dollars in Plan assets on which Rev. Alexander and the other members of the Class are relying for their retirement.

2.    As its name implies, ERISA was crafted to protect employee retirement funds. The statute aims "to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits." *Lockheed v. Spink*, 517 U.S. 882, 887 (1996) (citing *Nachman Corp. v. Oension Benefit Guaranty Corp.*, 446 U.S. 359, 375 (1980)). To this end,

ERISA imposes, among other requirements, fiduciary standards drawn from the law of trusts that are the highest known to the law on those who manage and administer plans. Accordingly, ERISA fiduciaries are bound to act with an "eye single" to the interest of the plan participants and beneficiaries to whom they owe a duty. *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1402 (9th Cir. 1995) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271,272 n.8 (2d Cir. 1982)).

3.    As described herein, this suit is about a complete and total abrogation of these fiduciary responsibilities by Defendants, resulting in numerous breaches of duty and resulting in a single, unmonitored individual, Defendant Harris, controlling all Plan assets and investments. Dr. Harris invested Plan assets in imprudent, extraordinarily risky investments that ultimately lost nearly $100 million of Plan participants' retirement savings. Astounding in its disloyalty and imprudence to the retirement security of those serving the Church, Defendants provided Dr. Harris sole authority to invest tens of millions of AMEC clergy's and other Church servants' retirement savings in a questionable and potentially unlawful purchase of undeveloped land in Florida, a promissory note to an Illinois installer of solar panels, and an even more foolish investment in a now non-existent capital venture outfit.

4.    The only known Plan Document and Summary Plan Description, as well as other written communications to the Church's clergy and other employees, including the Church's Doctrine and Discipline (published every four years to provide clergy and Church members updated information on Church beliefs, teachings and practices), all expressly state that the Plan is an ERISA plan, and is to be operated in full compliance with ERISA.

5.    Based on these express written promises, the Plan is an ERISA-governed church plan. Defendants are all fiduciaries and parties-in-interest of the Plan within the meaning of ERISA who are required by ERISA to act with the utmost prudence and solely in the interest of

the Plan's participants when making decisions with respect to Plan management and investments. Defendants have breached their fiduciary duties with respect to their disloyal and imprudent management of the Plan and its assets in violation of ERISA, to the detriment of AMEC's clergy and other Plan participants who have collectively lost nearly $100 million in retirement benefits. Plaintiff brings this action to recover the losses caused by Defendants' fiduciary breaches, correct and prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

6.    In the alternative, if this Plan is not directly governed by ERISA, Plaintiff asserts alternative claims under state law, including state contract and trust law, which must be read to mandate that the Plan be operated in compliance with ERISA.

## II.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims.

8.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, and because Plaintiff is a citizen of Maryland and Defendant AMEC is a citizen of Pennsylvania and Tennessee.

9.    This Court has personal jurisdiction over Dr. Jerome V. Harris, Bishop Samuel L. Green, Sr., the Plan's Trustees, the African Methodist Episcopal Church Ministerial Retirement Annuity Plan (collectively, the "Individual Defendants"), the Department of Retirement Services, the General Board of AMEC, the Council of Bishops of AMEC, and John and Jane Does because ERISA provides for nationwide service of process. The Court also has personal jurisdiction over the Individual Defendants pursuant to Federal Rule of Civil Procedure §

4(k)(1)(A) because they are all subject to a court of general jurisdiction in Maryland as a result of Defendant AMEC transacting business in and/or having significant contacts with this District.

10.    This Court has personal jurisdiction over AMEC because it transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

11.    Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2) because the Plan is administered in this District and many of the breaches complained of occurred in this District. Plaintiff resides in this District and Defendants do business in and can be found in this District and had multiple contacts with Plaintiff in this District concerning his Plan account that constitute breaches complained of herein.

### III.    PARTIES

12.    Plaintiff Rev. Cedric V. Alexander is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). He resides in Bowie, Maryland.

13.    Defendant Dr. Jerome V. Harris is the former Executive Director of the African Methodist Episcopal Church Department of Retirement Services and was a Plan Trustee from 2000 through July 2021. Dr. Harris is a resident of Memphis, Tennessee. Dr. Harris was a named fiduciary of the Plan by reason of being a Trustee within the meaning of ERISA Section 402(a)(2), 29 U.S.C. § 100. Dr. Harris was further a Plan fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that he had and exercised discretionary authority and control over Plan management and had and exercised authority and control over the disposition of the Plan's assets.

14.    Defendant Bishop Samuel L. Green, Sr. is the former Chair of the Department of Retirement Services. Bishop Green is a resident of Columbia, South Carolina. Bishop Green

was a Plan fiduciary within the meaning of 29 U.S.C. § 1002(21)(A), ERISA Section 3(21), in that he had and exercised discretionary authority and control over Plan management and had and exercised authority and control over the disposition of the Plan's assets.

15.    Defendant Plan Trustees are members of the General Board who serve as members of the Commission responsible for ongoing investment, control, and management of the Plan's assets.  The Trustees are fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plan by virtue of exercising authority or control over the disposition of the assets of the Plan.

16.    Defendant African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("Plan") is an "employee pension benefit plan" within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).

17.    Defendant Department of Retirement Services ("Department") is a separate legal entity from AMEC with the responsibility for administering the Plan.  On information and belief, the Department is located at 500 Eighth Avenue South, Nashville, Tennessee 37203.  The Department is a fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that it has authority or discretionary control respecting the management or disposition of the Plan's assets and administration of the Plan.

18.    Defendant African Methodist Episcopal Church, Inc. ("AMEC") is a corporation incorporated in Pennsylvania having its principal place of business located at 500 Eight Avenue South, Nashville, Tennessee 37203.  AMEC is the "Administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A)(i) and a fiduciary under ERISA.

19.    Defendant General Board of AMEC ("General Board") is the administrative body of the AMEC with elected members from the church.  Defendant AMEC acts through Defendant

General Board to carry out its authority to approve the Plan and amendments thereto, appoint, monitor and remove the Trustees. Through the grant and exercise of this power to appoint, monitor and remove other fiduciaries (the Trustees), General Board is itself a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A), ERISA Section 3(21).

20.     Defendant Council of Bishops is the executive body of AMEC, consisting of all Bishops of the Church. The Council has and exercises the general oversight authority of the Church. Relevant here, the Council of Bishops is responsible for enforcing the Church's Doctrine and Discipline, which, among other things, includes direction and promises with respect to the Plan. The Doctrine and Discipline expressly states that the Plan "shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act ("ERISA") as it presently exists and as it may be amended from time to time." It also provides detail about the Plan, including the clergy and other employees who must be enrolled by the Church and required Church contributions to the Plan on behalf of Plan participants. Though its enforcement power over the Plan's terms, the Council of Bishops is a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A), ERISA Section 3(21).

21.     Defendants John and Jane Does 1-20 are any potential additional parties who had or exercised fiduciary authority with respect to the Plan during the class period that are currently unknow to Plaintiff.

22.     Defendants Dr. Jerome V. Harris, Sr., Bishop Samuel L. Green, Sr., the Plan Trustees and John and Jane Does 1-20 are collectively referred to herein as "Individual Defendants."

## IV.     FACTS

### A.     The Plan

23.     Upon information and belief, the Church first provided a pension plan shortly following its quadrennial 1964 General Conference.  The Plan was called the Money Purchase Pension Plan and Trust, and the first plan document was effective December 1, 1964.  The Plan provided that it would be funded by AMEC at 12% percent of each plan participant's annual salary.  The Plan required AMEC to enroll all Bishops, General Officers, College Presidents, Deans of Theological Seminaries and Itinerant Elders.

24.     At the AMEC's quadrennial 1996 General Conference, the Church voted to amend the Money Purchase Pension Plan and Trust to establish a pension plan that "shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act ('ERISA') as it presently exists and as it may be amended from time to time."  This amended retirement plan remained funded entirely by AMEC through a contribution of 5-¼% of the Church's annual operating budget.

25.     Effective January 1, 1997, AMEC amended the plan document consistent with its decision to amend the Money Purchase Pension Plan, now called the African Methodist Episcopal Church Retirement Plan.

26.     The African Methodist Episcopal Church Retirement Plan required AMEC, in its role as Employer, to contribute 9% of each Plan participant's compensation not in excess of $20,000.  The Plan also allowed a participant or the AMEC to make an additional 9% contribution in excess of $20,000.

27.     As with the Money Purchase Pension Plan, all Bishops, General Officers, College Presidents, Deans of Theological Seminaries and Itinerant Elders were Plan participants, and

AMEC was required to make contributions to the Plan to fund their accounts.  In addition, all employees who completed 1,000 hours of service were considered Plan participants and were required to complete an application to begin participation.  However, if a qualified employee did not complete an application, AMEC was required to file the application on their behalf, and if qualified, to make contributions and fund their accounts.

28.    Consistent with AMEC's vote at the quadrennial 1996 General Conference, the Plan document expressly requires that the Plan comply with ERISA.  The Plan documents Article II, Administration, 2.1 Powers and Responsibilities of the Employer, state that  "(a) In addition to the general powers and responsibilities otherwise provided for in the Plan, the Employer shall be empowered to appoint and remove the Trustee from time to time as it deems necessary for the proper administration of the Plan to assure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in ***accordance with the terms of this Agreement, the Code, and the Act.***"  (Emphasis added).  The term "Act" is defined in the Plan document as the Employee Retirement Income Security Act of 1974 (ERISA).

29.    The lack of availability or any subsequent Plan documents creates some difficulty in determining whether there were any changes to the Plan after 1997.  However, upon information and belief, in or about 2000, AMEC created a separate Retirement plan exclusively for Pastors and Presiding Elders, funded entirely by AMEC's General Treasury.

30.    Upon information and belief, a voluntary contribution plan, described as a defined contribution 401(k) plan, was also created by the Church, effective January 1, 2003.  Upon information and belief, a summary plan description ("SPD") currently found on the Church's website for Church employees is the only SPD issued by AMEC.  The document describes the defined contribution plan, requiring plan participants who wish to participate to elect to reduce

compensation to make contributions to the plan.  The SPD also describes a discretionary profit-sharing contribution made by AMEC that is similar in its amount and general design to that described in the 1997 African Methodist Episcopal Church Retirement Plan.

31.    On its first page, the Plan's SPD declares, like the 1997 Plan document, that "The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)."

32.    In 2005, AMEC announced that a consolidated Plan document would be (or perhaps already had been) drafted, governing all "retirement investment plans."  Before this change, sometime between 2000 and 2005, AMEC provided three separate plans.  Going forward, all three would become components of a single plan, governed by a single Plan document, consisting of three "Levels."

33.    Plaintiff Rev. Alexander was eligible for all three of these Levels and received contributions from AMEC funding his retirement account for Level II and Level III.

34.    Upon information and belief, this combined retirement plan is now titled the African Methodist Episcopal Church Ministerial Retirement Annuity Plan and is the operative plan at issue.

35.    Upon information and belief, there is no summary plan description describing Level II and Level III components of the Plan.  As described above, the Summary Plan Description provides some detail concerning Level I benefits, but the only other retirement savings described in the document is the contribution amount of 9% made by AMEC included in the now superseded African Methodist Episcopal Church Retirement Plan.

36.     Although Defendants have either not drafted an amended Plan document or cannot locate it, Plaintiff and other members of the Class receive the Church's Doctrine and Discipline published every four years following AMEC's quadrennial General Conference.  The

Doctrine and Discipline provides clergy and Church members updated information on Church beliefs, teachings and practices.  It also includes a section on the Department of Retirement Services and the Plan.

37.    Starting from at least the 2000 Doctrine and Discipline published for Plan participants and other members of the Church to the most current 2016 version, the Doctrine and Discipline states that the Plan "***shall be*** consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)" (emphasis added).  In addition, every such Doctrine and Discipline describes the funding of the Plan by the Church for Level II, and the required enrollment of "[a]ll Bishops, General Officers, College Presidents, Dean of Theological Seminaries and Itinerant Elders and all other ordained persons receiving an appointment to a pastoral charge," as described above.  These Doctrine and Discipline documents also state that the Plan is "all-inclusive so that no salaried servant of the AME Church will be excluded, regardless of age."

38.    In the Department of Retirement Services' 2017 Annual Report (a section of the annual General Board Report following the Church's July 2016 Quadrennial Session of the General Conference), Defendants Green and Harris wrote that Level III of the Plan provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders.

39.    The 1997 Plan document and Summary Plan Description state that the Plan and Trust are governed by the laws of the State of Tennessee.  These documents are silent as to venue.

B.    **Reverend Alexander's Employment, Retirement and Request for Retirement Benefits**

40.    Reverend Cedric V. Alexander served the AME Church for nearly 26 years beginning in 1996, when he first served at Brookins Community AME Church in Los Angeles, as Associate Minister.

41.    In 2004, Rev. Alexander received his first Pastoral Appointment from Bishop John Bryant to the First AME Church in Richmond, California.  He was later reappointed by Bishop T. Larry Kirkland, Sr. and served in a Senior Pastor position through 2010.

42.    In 2010, Rev. Alexander was appointed as Pastor by T. Larry Kirkland, Sr. to the Walker Temple AME Church in Los Angeles, California where he served until 2012.  In 2012, he was appointed by Bishop T. Larry Kirkland, Sr. to serve as Senior Pastor to the Price Chapel AME Church in Los Angeles, California.

43.    In 2010, Rev. Alexander began participating in the Plan and his local church made contributions on his behalf to the Plan.  He believed, based on documents provided to him, that the contributions to the Plan for his account were invested in an annuity investment with Symetra Financial.

44.    Rev. Alexander received a benefit account statement for the period of July 1, 2010 and September 30, 2010, showing contributions funded by AMEC and local churches through the Episcopal Districts with a total vested balance of $3,161.15.  The statement listed Symetra Financial as an AMEC Annuity Plan partner, confirming Rev. Alexander's understanding and belief that his account was invested with Symetra.  No other Plan investment was listed in the account statement.

45.    Plaintiff's benefit account statement for the period October 1, 2013 through December 31, 2013, showed growth of his account to a vested balance of $12,438.96, with contributions made by AMEC and local churches.  This statement again listed Symetra as an AMEC Annuity Plan partner and did not specify any other investments.

46.    In 2014 through 2019, Rev. Alexander received Presiding Elder appointments. During this time, Rev. Alexander continued to participate in the Plan and AMEC, and 12 churches in the San Francisco-Sacramento District continued to contribute to the Plan on his behalf.

47.    The General Board Orientation Handbook, issued for each four-year period between the Church's Quadrennial Sessions, requires Defendant General Board to hire an auditor to conduct an annual audit of the Department, including with respect to the contributions and investments in the Plan.

48.    As stated in the General Board Orientation Handbook, the General Board is also to require the Plan's Executive Director to provide each General Board member a report on the Plan and its assets one month before the annual General Board meeting.

49.    At the July 2016, 50th Quadrennial Session General Conference of the AME Church, Defendant Harris as Executive Director of the Department reported on the status of the Plan.  In his introduction, Dr. Harris thanked "the nearly 5,000 ministerial and lay employee participants for their continued confidence in [the] efforts to provide for their retirement future. It is because of your personal commitment and the sacrificial support of the churches that you serve that the AMEC Retirement Plan has continued to experience unparalleled growth and financial success for more than fifty-two years."

50.    In his presentation, Dr. Harris reported that as of fiscal year end 2015, the Plan had a total value of $113,388,374.50 and as of the fiscal year end had grown to $117,521,777.23.

51.    In 2017, Dr. Harris again reported on the financial condition of the Plan.  In this presentation he showed a bar graph indicating significant growth in Plan assets between 2012 and 2017 as follows:



52.    In his overview, Dr. Harris stated that the last twelve months had been a time of turmoil and uncertainty which had an impact on the financial markets both in the United States and globally.  He further stated that it was because of this uncertainty and market instability that the Department "has continued to adhere to a conservative investment strategy which has been in place since 2001.  It is a strategy that has resulted in the continuous and consistent growth of the AMEC Ministerial Retirement Annuity Plan portfolio as reflected in the following pages of this report."    The report indicated that as of fiscal year end 2017 the Plan portfolio total was $119,800,961.03.

53.    The audit of the Department of Retirement Services for 2016-2017 stated that "Symetra Financial and Retirement Services Company" is the investment company through which Plan annuity investments are purchased.  The audits states that "[a]s of March 31, 2017 and 2016, the total account balances of annuities held and invested on behalf of the clergy servants and full time employees of the African Methodist Episcopal Church was $119,801,000 and $117,522,000."

54.    Between the years 2014 and his retirement in 2020, Rev. Alexander served the African Methodist Episcopal Church for the Fifth District and continued to participate in the Plan and received contributions from AMEC and local churches to his account.

55.    Rev. Alexander's Plan account statement for the period October 1, 2018 through December 31, 2018 showed a vested balance of $58,579.15.  This statement continued to list Symetra as an AMEC Annuity Plan partner where Rev. Alexander believed his account funds to be invested.

56.    On August 4, 2020, Rev. Alexander wrote to Bishop Clement W. Fugh requesting to retire effective September 10, 2020.  On November 30, 2020, Dr. Harris, as Executive

Director of the Department, confirmed Rev. Alexander's retirement status with an effective date of September 10, 2020.

57.     Rev. Alexander's Plan account statement for the period January 1, 2021, through March 31, 2021, showed a vested balance of $86,631.75.

58.     On September 13, 2021, Rev. Alexander completed and signed an Authorization for Distribution form requesting a direct rollover of his Plan assets to an Individual Retirement Account ("IRA").

59.     On October 8, 2021, Rev. Alexander sent an email to Rev. Dr. James F. Miller, the newly elected Executive Director of the Department of Retirement Services following up on the rollover request.  At that time, Rev. Alexander had been informed that the rollover of his retirement funds had been held up due to a pending audit.  Rev. Dr. Miller responded that the Plan's funds had been frozen.

**C.      The Audit of the Plan and the Missing Assets**

60.     On November 9, 2021, Rev. Dr. Miller wrote to the Retirement Plan Participants stating that in the last communication they indicated that an audit was being conducted and that while they hoped it would be completed it was not and that it was taking longer than they anticipated.

61.     On December 14, 2021, a news article by the Atlanta Journal-Constitution reported that AMCE revealed it was investigating "possible financial irregularities" with its retirement fund investments.  At that time, Rev. Alexander heard rumors that the Plan had lost a large share of his and other clergy and employees' retirement savings, totaling approximately $90 million of Plan assets.

62.     On January 31, 2022, a meeting of the General Board confirmed that the Plan had, in fact, lost more than $90 million, with the exact amount unknown.  The meeting was recorded and made available to the public via posting the video on the internet.  At that meeting it was reported that as recently as June 30, 2021, the Plan Trust had a value of $126,800,000.  More than $90 million of this $126.8 million was missing, and no one connected with the Church, except its former Department of Retirement Services Executive Director, Defendant Harris, knew where the money and other plan related records went.

63.     Those attending the January 31st meeting were told that despite repeated representations to Plan participants over the last two decades, the Plan's assets were not all invested in annuities provided by Symetra.  Instead, the Council of Bishops, General Board, Department of Retirement Services, the chair of the Department, Bishop Green and the Trustees allowed a single individual, Defendant Harris, to exercise full decision making authority over the use of all Plan assets.  Rev. Miller, Defendant Harris's replacement as Executive Director of the Department of Retirement Services, put it this way: "never again will we allow one person to count the money," essentially conceding that the Plan's other fiduciaries previously had completely abdicated their duties owed to the Plan and the Plan's participants, including Plaintiff Alexander and the other members of the Class.

64.     Upon investigation into the missing assets, AMEC learned that tens of millions of dollars had been invested in high-risk, speculative and demonstratively imprudent investments in Motorskill Ventures Group (a now defunct venture capital outfit), through investments in "Motorskill Ventures" and "Motorskill Asia Ventures," and a separate investment in Financial Freedom Fund, LLC, which in turn invested in additional Motorskill Ventures Group investments called "Motorskill Ventures 1" and "Motorskill Asia Ventures 1."  On June 11,

2021, the Church's investigative committee received written notification from Motorskill Ventures Group that these investments are worthless, the funds in which the Plan invested were terminated by Motorskill, and that the Plan will recover nothing from its investments.

65.     The investigative committee reported that they had only been able to verify $36,900,000 of the Plan assets invested with Symetra along with $1,000,000 of value for an investment in another speculative, high-risk investment in undeveloped real estate located in Key Marco Island, Florida.  Defendant Harris initially invested $1.5 million of the Plan's assets in the undeveloped land, reflecting a loss of $500,000 and providing merit to the pejorative phrase "Florida land deal."

66.     Defendant Harris's investment in Financial Freedom Fund, LLC, a manager of a private Real Estate Investment Trust (REIT) that provides loans for commercial and residential construction, also included the use of Plan assets to provide a promissory note to an Illinois installer of solar panels called Day and Night Solar.

67.     Upon information and belief, Defendant Harris would not have secretly moved tens of millions of dollars in Plan asset's out of Symetra annuity investments and invested them in a risky or fraudulent venture capital company Motorskill Ventures Group, Financial Freedom Fund, LLC, or invested an additional $1.5 million in a Florida land deal if he did not stand to benefit in some way.

68.     At the meeting on January 31, 2022, Rev. Dr. Miller informed the attendees of the meeting that the office of the Executive Director of the Department of Retirement Services had been emptied, with nothing in the office cabinets but "empty files and paperclips."  Even the most current version of the Plan document could not be located.

69.     During the first week of February 2022, Rev. Alexander received a letter from the Department of Retirement Services informing Plan participants of "troubling news."  The letter was intended to provide the participants with an update on the investigation into possible financial irregularities. The letters states that federal investigatory agencies and outside consultants were working on the matter.  It further informed participants that the Plan funds were frozen, and distributions delayed pending the investigative findings.  As of the date of the filing of this Complaint, Plaintiff has not received any of his retirement benefits, despite being retired, without much income, for well over a year.  All other members of the Class similarly have had their pension payments halted and/or have been informed that they have only one-third of the amount or less in their individual retirement accounts than they had previously been told.

70.     As of the date of this Complaint, Plaintiff's total Plan account of vested benefits has been reduced by Defendants from $86,631.75 to $26,025.29, a reduction of approximately 70% of his retirement savings.   Upon information and belief, all Plan participants' vested benefits have been similarly reduced by approximately 70%.

### V.    CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action on behalf of:

> All participants and beneficiaries in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.  Members of the Trustees, Council of Bishops, General Board, and any employees who have responsibility or involvement in the administration of the Plan, or who subsequently determined to be fiduciaries of the Plan, including the Individual Defendants, and their beneficiaries and immediate families are excluded from the Class.

72.     Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1) and/or (b)(3).

A.    **Numerosity**

73.    The exact number of Class members is unknown to Plaintiff at this time but may be readily determined from records maintained by AMEC.  On information and belief, the Plan has nearly 5,000 participants and therefore satisfies the numerosity requirement because it is composed of thousands of persons.  The number of Class members is so large that joinder of all its members is impracticable.

B.    **Commonality**

74.    Common questions of law and fact include:

(a) Whether the Plan is deemed to be an ERISA-covered plan;

(b) Whether the Plan has violated its obligation under Section 502(a)(1)(B) of ERISA to pay Plan benefits;

(c) Whether Defendants have failed to administer, fund and otherwise operate the Plan in accordance with ERISA;

(d) Whether Defendant Harris is an ERISA fiduciary or a fiduciary under state trust law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan;

(e) Whether Defendant Bishop Green is an ERISA fiduciary or a fiduciary under state trust law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan;

(f) Whether Defendant Trustees are ERISA fiduciaries or are fiduciaries under common law or state trust law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan;

(g) Whether Defendant General Board is an ERISA fiduciary or a fiduciary under common law or state trust law and is responsible for the appointment, removal and monitoring of the Defendant Trustee fiduciaries, Defendant Bishop Green and Defendant Harris;

(h) Whether Defendant Harris breached his fiduciary duties under ERISA or state trust law in the management of the Plan, including the investment of Plan assets;

(i) Whether Defendant Trustees breached their ERISA or fiduciary duties under ERISA or state trust law in monitoring the investment options in the Plan;

(j) Whether Dr. Harris caused the Plan to engage in prohibited transactions in violation of ERISA Section 406, 29 U.S.C. § 1106, during the Class Period;

(k) Whether Defendants have committed co-fiduciary breaches in violation of ERISA Section 405;

(l) Whether AMEC breached its contract with Plaintiff and the Class with respect to the management of the Plan and its assets and the payment of retirement benefits;

(m) Whether AMEC should be equitably estopped from paying Plaintiff and the Class the amount of benefits shown on their 2021 benefits statements;

(n) Whether AMEC violated the Tennessee Wage Protection Act; and

(o) The extent to which and whether the Plan and its participants suffered losses and Defendants profited as a result of their fiduciary breaches and/or violations of ERISA or state law.

## C.    Typicality

75.    Plaintiff's claims are typical of the claims of the other members of the Class because his claims arise from the same event, practice and/or course of conduct, namely Defendants' failure to maintain the Plan in accordance with ERISA, the requirements of the Plan documents, state law and/or common law.  Plaintiff's claims are also typical because all Class members are similarly affected by Defendants' wrongful conduct.  Furthermore, to the extent Plaintiff seeks relief on behalf of the Plan pursuant to Section 502(a)(2) of ERISA, his claims are not only typical of, but the same as a claim under Section 502(a)(2) brought by any other Class Member.

76.     Plaintiff's claims are also typical of the claims of the other members of the Class because, to the extent Plaintiff seeks equitable relief, it will affect all Class members equally. All Class members were injured and continue to be injured in the same manner by the alleged breaches of fiduciary duty.  Plaintiff has no interests that are antagonistic to the claims of the Class.  He understands that this matter cannot be settled without the Court's approval.

77.     AMEC does not have any defenses unique to Plaintiff's claims that would make Plaintiff's claims atypical of the remainder of the Class.

**D.     Adequacy**

78.     Plaintiff will fairly and adequately represent and protect the interests of all members of the Class.   In additional to his exceptional educational accreditations, Rev. Alexander was awarded Pastor of the Year by the Southern California Conference Lay Organization and Fifth District Lay Organization in 2014, the Jarena Lee Appreciation Award by the California Conference of Women in Ministry in 2018, and the Episcopal Award for Distinguished Service by Presiding Bishop, Fifth Episcopal District in 2020.

79.     Plaintiff does not have any interests antagonistic to or in conflict with the interests of the Class.

80.     Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

81.     Plaintiff has engaged counsel with extensive experience in ERISA and ERISA class actions in particular.

### E.    Rule 23(b)(1) Requirements

82.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

83.    The requirements of Rule 23(b)(1)(B) are satisfied because adjudications of these claims by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the ability of other members of the Class to protect their interests.

### F.    Rule 23(b)(2) Requirements

84.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### G.    Rule 23(b)(3) Requirements

85.    If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter.

## VI.    CAUSES OF ACTION

### COUNT I

Request for a Declaratory Judgment
(Against All Defendants)

86.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

87.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief that the African Methodist Episcopal Church Ministerial Retirement Annuity Plan is an ERISA-governed church plan.  Defendants have expressly adopted the Plan as an ERISA plan and repeatedly represented to Plan participants and beneficiaries that ERISA governs the Plan.

88.    In the only Plan document obtainable by Plaintiff, issued in 1997 after the Church amended the Money Purchase Pension Plan and Trust in 1996, it states in its Article II, Administration, 2.1 Powers and Responsibilities of the Employer,  "(a) In addition to the general powers and responsibilities otherwise provided for in the Plan, the Employer shall be empowered to appoint and remove the Trustee from time to time as it deems necessary for the proper administration of the Plan to assure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in ***accordance with the terms of this Agreement, the Code, and the Act."***  (Emphasis added).  The term "Act" is defined in the Plan document as the Employee Retirement Income Security Act of 1974 (ERISA).

89.    On its first page, the Plan's Summary Plan Description similarly declares that "The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)."

90.    From the first Doctrine and Discipline published for plan participants and other members of the Church after the Plan was established to the most current 2016 version, the Doctrine and Discipline states that the Plan "shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)."

## COUNT II

Claim for Plan Benefits Under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)
(Against Defendants AMEC and the Plan)

91.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

92.    ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), empowers plan participants to bring suit to recover benefits due them under the terms of the plan, to enforce their rights under the terms of the plan, or to clarify their rights to future benefits under the plan.

93.    The Plan is an ERISA plan and Rev. Alexander is a participant in the Plan.

94.    On September 13, 2021, a year after retiring in 2020, Rev. Alexander requested a rollover of his Plan assets into an IRA.

95.    The most recent account statement he had received prior to this request showed that he had an account balance of $86,631.75.

96.    He was informed that this distribution was being held up because of an audit.

97.    This audit was necessitated by the loss of over $90 million in stated Plan assets.

98.    To date, he has not received a penny of his pension.

99.    No other retirees are currently receiving their Plan benefits.

100.    Rev. Alexander's new account balance on the Church's website shows his account balance reduced from more than $86,000 to $26,025.29, representing a loss of more than two-thirds of the value of his pension account.

101.    Rev. Alexander is entitled to and has been denied a rollover distribution of this amount.

102.    AMEC and the Plan have not provided a procedure for Rev. Alexander to appeal the decision to freeze the Plan's benefit payments and to refuse to pay the retirement benefits owed to him and other retirees in the amounts listed in their 2021 account statements for an indefinite period.   Rev. Alexander has therefore either exhausted the Plan's administrative process or any such procedures would be futile.

## COUNT III

Breach of Fiduciary Duties for Failing to Prudently and Loyally Select, Retain and Monitor Plan
Investments in Violation of ERISA Section 404, 29 U.S.C. § 1104
(Against Defendants Department of Retirement Services, Green, Harris and Trustees)

103.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

104.    29 U.S.C. Section 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection, retention and monitoring of the Plan's investments.

105.    The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA.   These Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis, and eliminating imprudent ones.   This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]"   *Tibble v. Edison Intern.*, 575 U.S. 523, 530 (2015).

106.    As described throughout this Complaint, Defendants Department of Retirement Services, Bishop Green and the Trustees completely abandoned their fiduciary duties with respect to administration of the Plan, including the selection and monitoring of Plan investments and instead permitted a single fiduciary, Defendant Harris, to make all investment decisions for the Plan.  This misconduct – Defendants' indifference to Plan assets and retirement Plan participants' retirement savings – resulted in Defendant Harris's extraordinarily high-risk, speculative investments in the Motorskill Venture Group (a possibly fraudulent venture capital business), Day and Night Solar and undeveloped real estate in Key Marco Island, Florida and to the loss or disappearance of most or all of the Plan assets placed in these investments, more than $90 million in total.

107.    Through these failures to manage and administer the Plan and its assets, these Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

108.    Through their actions and inactions, these Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

109.    As a direct and proximate result of the above breaches of fiduciary duties, the Plan and their participants have suffered a minimum of tens of millions of dollars of losses in retirement assets.  Pursuant to ERISA, these Defendants are liable to restore all losses suffered

by the Plan and its participants and beneficiaries caused by the breaches of fiduciary duty.  29 U.S.C. §§ 1109(a), 1132(a)(2) and 1132(a)(3).

## COUNT IV

Violations of ERISA Section 406(b), 29 U.S.C. § 1106(b), for
Engaging in Prohibited Transactions
(Against Defendant Harris)

110.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

111.    As described throughout this Complaint, Defendant Harris is a fiduciary of the Plan.

112.    ERISA Section 406(b)(1), 29 U.S.C. § 1106(b) establishes a flat prohibition on fiduciary self-dealing, providing that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b).

113.    Upon information and belief, Defendant Harris invested Plan assets in Motorskill Ventures Group, Financial Freedom Fund, LLC and in undeveloped real estate in Florida in order to benefit himself, financially or otherwise, and to serve his own self-interest in violation of ERISA Section 406(b)(1).

114.    As a direct and proximate result of the above violations of ERISA Section 406(b)(1), the Plan and its participants suffered millions of dollars of losses in retirement assets.

115.    Pursuant to ERISA, 29 U.S.C. §1109(a), §1132(a)(2) and (a)(3), Defendant Harris is liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned from these unlawful investments of Plan assets.

## COUNT V

Breaches of Fiduciary Duty for Failure to Monitor Appointed Fiduciaries
(Against Defendants AMEC, Council of Bishops, General Board,
Department of Retirement Services, and Green)

116.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

117.    As described throughout this Complaint, Defendants AMEC, General Board, Department of Retirement Services, Bishop Green and the Trustees were named fiduciaries pursuant to ERISA Section 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  As such, they were bound by the duties of loyalty, exclusive purpose, and prudence.

118.    The scope of the fiduciary responsibilities of AMEC, Council of Bishops, General Board, Department of Retirement Services and Bishop Green included the responsibility to appoint, remove, and monitor the performance of other fiduciaries, including Defendants Trustees and Harris.

119.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

120.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that they may review and evaluate, on an ongoing basis, whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their

appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

121.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with the complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

122.    An appointing and monitoring fiduciary also has the express power and inherent obligation to remove fiduciaries who are failing to abide by the requirements of ERISA in the performance of their duties.

123.    These Defendants breached their fiduciary monitoring duties by, among other things, (1) failing to inquire or ask questions of the sole fiduciary making all investment decisions for the Plan, Defendant Harris, (2) failing to obtain reports from the Trustees concerning management of the Plan and (3) failing to remove Harris and the Trustees for their own fiduciary breaches.

## **COUNT VI**

Claim for Failure to Establish the Plan Pursuant to a Written Instrument Meeting the
Requirements of ERISA Section 402, 29 U.S.C. § 1102
(Against Defendants AMEC. Council of Bishops and General Board)

124.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

125.    ERISA Section 402, 29 U.S.C. § 1102, provides that every plan will be established pursuant to a written instrument which will provide among other things "for one or

more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan" and will "provide a procedure for establishing and carrying out a funding policy and method constituent with the objectives of the plan and the requirements of [Title I of ERISA]."

126.    Although the benefits provided by the Plan were described to the Plan participants in various written communications, including an outdated Plan document, an inaccurate Summary Plan Description and the Doctrine and Discipline documents that were issued every four years, AMEC has publicly stated that it does not currently possess the operative Plan document, if any, and cannot therefore provide instruments and documents governing the Plan pursuant to 29 U.S.C. § 1024(b), 29 C.F.R. § 2550.404a-5(d), 29 CFR § 2550.404c-1(b)(2)(i)(B), and 29 C.F.R. § 2550.404c-5(c).  Accordingly, Defendant AMEC, Council of Bishops and General Board have violated ERISA § 402, 29 U.S.C. § 1102.

127.    By failing to have or maintain a current and accurate Plan document, Defendants AMEC, Council of Bishops and General Board have violated ERISA Section 402.

## COUNT VII

Breach of Fiduciary Duties for Failing to Follow the Terms of the Plan
in Violation of ERISA Section 404, 29 U.S.C. § 1104
(Against All Defendants)

128.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

129.    Despite Defendants' failure to possess an operative Plan document, AMEC's most recent 2016 Doctrine and Discipline provides the "Duties and Responsibilities" the Department, Executive Director and Trustees, which details many of the provisions of the Plan.

130.    The Doctrine and Discipline states that the Plan "shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)."  On its first page, the Plan's Summary Plan Description similarly declares that "The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)".

131.    The Doctrine and Discipline states that all bishops, general officers, college presidents/deans of theological seminaries, itinerant elders and all other ordained persons receiving an appointment to a pastoral charge must be enrolled and become participants in the Plan.

132.    This Doctrine and Discipline also states that the Plan is "all-inclusive so that no salaried servant of the AME Church will be excluded, regardless of age."

133.    In the Department of Retirement Services 2017 Annual Report (a section of the annual General Board Report following the Church's July 2016 Quadrennial Session of the General Conference), Defendants Green and Harris wrote that Level III of the Plan provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders.

134.    On information and belief, Defendants failed to enroll all active Pastors and Presiding Elders in the Plan in contravention to the Plan's terms, and accordingly, failed to make the required Level III contributions for all clergy-participants, in violation of their fiduciary duties under 29 U.S.C. § 1104(a)(1)(D).

135.    Further, the Plan requires Church-funded contributions of twelve percent (12%) of each participant's salary, with a minimum contribution of $312 to be paid twice annually, first at the Church's Annual Conference and second at the Church's Mid-Year Convocation.

136.    Upon information and belief, Defendants failed to follow or ensure that the local churched followed the Plan's terms as they relate to these required contributions for many Class members, in violation of their fiduciary duties under 29 U.S.C. § 1104(a)(1)(D).

137.    As a direct and proximate result of the above breaches of fiduciary duties, the Plan and their participants have suffered millions of dollars of losses in retirement assets. Pursuant to ERISA, 29 U.S.C. §§ 1109(a), 1132(a)(2) and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan caused by the breaches of fiduciary duty.

## COUNT VIII

Claim for Violation of ERISA Reporting and Disclosure Provisions
(Against Defendant AMEC, or in the alternative, the Department of Retirement Services)

138.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

### A.    Pension Benefit Statements

139.    ERISA Section 105(a) requires the administrator of an individual account plan to furnish plan participants with a pension benefit statement either quarterly or annually, depending on the design of the plan.  29 U.S.C. § 1025(a).  This statement must indicate, among other detailed requirements, the "value of each investment to which assets of the individual account have been allocated" *Id*. at § 1025(a)(2)(B)(i).

140.    Since at least the time the Plan started placing Plan assets in investments outside of Symetra, AMEC, or in the alternative, the Department of Retirement Services, has failed to provide Plaintiff or any member of the Class with a pension benefit statement that meets the requirements of 29 U.S.C. § 1025(a)(2)(B)(i).

B.     **Summary Plan Descriptions**

141.     ERISA Section 102, 29 U.S.C. § 1022, requires the SPD to apprise plan participants of their rights and obligations under the plan.  ERISA Section 104, 29 U.S.C. § 1024 requires that SPDs be distributed within 90 days to new participants, and that an updated SPD to be distributed to all plan participants and beneficiaries every fifth year if a Plan is amended and every 10 years if a Plan has not been amended during that time period.

142.     Since at least 2002, AMEC, or in the alternative, the Department of Retirement Services, has failed to provide Plaintiff or any member of the Class with a current Summary Plan Description.  The SPD on the Church's website is as many as 16 years old and is limited to Level I benefits (indicating that the Plan is limited to benefits under provisions of IRS Code 401(k), ignoring Level II and III of the Plan.

143.     Because AMEC, or in the alternative, the Department of Retirement Services, has been the Plan Administrator of the Plan at all relevant times, it violated ERISA Sections 102, 104, 29 U.S.C. §§ 1022, 1024, by failing to provide Plaintiff and members of the Class with accurate and updated SPDs.

C.     **Annual Reports**

144.     AMEC, or in the alternative, the Department of Retirement Services, has failed to file any annual reports with respect to the Plan with the Secretary of Labor in compliance with ERISA Sections 103, 29 U.S.C § 1023, nor have they ever filed a Form 5500 and associated schedules and attachments, which the Secretary has approved as an alternative method of compliance with ERISA Sections 103, 29 U.S.C. § 1023.

145.     Because AMEC, or in the alternative, the Department of Retirement Services, has been the Plan Administrator of the Plan at all relevant times, it violated ERISA Section 104(a),

29 U.S.C. § 1024(a), by failing to file annual reports with respect to the Plan with the Secretary of Labor in compliance with ERISA Section 103, 29 U.S.C. § 1023, or Form 5500s and associated schedules and attachments that the Secretary has approved as an alternate method of compliance with ERISA Section 103, 29 U.S.C. § 1023.

### D.    <u>Summary Annual Reports</u>

146.    AMEC, or in the alternative, the Department of Retirement Services, has failed to furnish Plaintiff or any member of the Class with a Summary Annual Report with respect to the Plan in compliance with ERISA Section 104(b)(3) and regulations promulgated thereunder. ERISA Section 104(b)(3), 29 U.S.C. § 1024(b)(3).

147.    Because AMEC, or in the alternative, the Department of Retirement Services, has been the Plan Administrator of the Plan at all relevant times, it violated ERISA Section 104(b)(3), 29 U.S.C. § 1024(b)(3), by failing to furnish Plaintiff or any member of the Class with a Summary Annual Report with respect to the Plan in compliance with ERISA section 104(b)(3) and regulations promulgated thereunder. ERISA Section 104(b)(3), 29 U.S.C. § 1024(b)(3).

<u>COUNT IX</u>

Claim for Co-Fiduciary Breaches in
Violation of ERISA Section 405(a), 29 U.S.C. § 1105(a)
(Against All Defendants)

148.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

149.    In addition to liability under any other provision of ERISA, Section 405(a) imposes liability on a fiduciary for breach of a fiduciary responsibility of another fiduciary of the same plan if a fiduciary: (1) knowingly participates in or knowingly conceals another fiduciary's breaches; (2) through a failure to comply with his or her own fiduciary responsibilities, has

enabled the other fiduciary's breaches; or (3) if he or she has knowledge of another fiduciary's

breaches and makes no reasonable efforts under the circumstances to remedy those breaches.  29

U.S.C. § 1105(a),

150.    As fiduciaries with respect to the Plan, Defendants have separately and jointly

violated their duties as co-fiduciaries through, among other things:

      a.    Their complete abdication of their own fiduciary duties with respect to

Plan management, which enabled Defendant Harris to make wildly

imprudent Plan investments and to lose the majority of Plan assets;

      b.    Their failure to take any action to remedy obvious fiduciary breaches,

despite their obvious knowledge of breaches by their co-fiduciaries'

breaches, such as the failure by Defendant Harris and other fiduciaries to

follow Plan documents, to review and report on Plan investments and to

abide by ERISA's reporting and disclosure requirements.

## COUNT X[1]

Claim for Breach of Contract and Specific Performance
(In the Alternative to Counts I-IX)
(Against Defendant AMEC)

151.    Plaintiff incorporates and realleges the allegations contained in the foregoing

paragraphs of this Complaint as if fully set forth herein.

152.    At all relevant times, AMEC was the "sponsor" and "employer" with respect to

the Plan.

153.    AMEC has repeatedly represented in writing that the Plan's fiduciaries were

committed to "adhere to a conservative investment strategy," and had done so since 2001,

---

[1] Counts X through XII state alternative claims for relief under state and common law in the
event the Court determines that the Plan is a church plan exempt from ERISA.

resulting "in the continuous and consistent growth of the AMEC Ministerial Retirement Annuity plan portfolio." Symetra was the only investment listed as a Plan investment on plan participants' benefits statements, consistent with AMEC's promises that the Plan's participant's retirement savings were invested in a safe, conservative investment strategy.  AMEC has also repeated these promises in the Plan document, Summary Plan Description, Doctrine and Discipline, plan participants' quarterly benefits' statements and other documents, that Level II benefits are funded by the Church for all eligible employees at 12% of salary, and that the Church funds Level III benefits for all Pastors and Presiding Elders with retirement benefits funded annually by the Church's General Treasury.

154.    AMEC also represented in the Plan document, summary plan description, and Doctrine and Disciplines from 2000 to the most current publication that the Plan would be operated in compliance with ERISA and provide all the protections that ERISA entails.

155.    In exchange for employment, Plaintiff and the other Class members were offered renumeration which included retirement savings benefits through a Plan governed by ERISA.

156.    The written promises made by AMEC were clearly communicated to Plaintiff and the other Class members, including through the summary plan description found on the Church's website, the quadrennial General Conference, the quadrennial Doctrine and Discipline text that follows each General Conference, the Church's annual conference reports, and plan participants' quarterly benefits statements.

157.    Plaintiff and the other Class members accepted AMEC's offer by commencing or continuing to work after AMEC's promise to pay and fund pension benefits pursuant to an ERISA-covered Plan.

158.    Plaintiff and the other Class members' continued work for AMEC constituted consideration for the promises contained in the Plan's documents.

159.    Accordingly, AMEC's Plan documents constitute enforceable contracts.

160.    By continuing to work for the Church, the Plaintiff and the other Class members performed their obligations under the contracts and satisfied the conditions required to trigger AMEC's duty to provide retirement benefits pursuant to an ERISA-compliant plan, including but not limited to funding all participant accounts pursuant to the Plan's terms and restoring all accounts to the amounts listed on Plan participants' last benefits statements and paying benefits to retirees upon request.

161.    Defendant AMEC breached its obligations under the contracts by failing to follow the provisions of ERISA as promised, including failing to make contributions pursuant to Plan terms, imprudently and disloyally making highly risky, self-dealing investments with Plan assets, which led to the loss of over $90 million in Plan assets and participant retirement benefits, and in failing to pay Rev. Alexander and other the retirement benefits to which they are entitled when requested to do so.

162.    Defendant AMEC further breached the implied covenant of good faith and fair dealing, as AMEC failed to exercise good faith in the performance of its obligations to comply with ERISA.

163.    AMEC willfully failed to perform, evaded the spirit of the bargain, and failed to act in a manner consistent with the reasonable expectations of the Plaintiff and the Class to the extent that it failed to adhere to even minimum levels of fiduciary responsibilities under ERISA and the terms of the Plan by (a) failing to enroll all eligible participants; (b) failing to fund Plan participants' account pursuant to the Plan's terms; and (c) allowing a single fiduciary, Defendant

Harris, to make all investment decisions for the Plan, with no oversight by any other fiduciary or its advisors or agents, all of which resulted in losses of tens of millions of dollars in retirement savings for the Church's clergy and other eligible participants.

164.    Plaintiff and the Class are entitled to specific performance of the obligations contained in the Plan documents, including: (a) AMEC's obligation to operate the Plan in accordance with ERISA; (b) AMEC's obligation to enroll all eligible employees in the Plan; (c) AMEC's obligation to make contributions pursuant to the Plan's terms; (d) AMEC's obligation to restore each Plan participants' accounts to the amount stated in the last benefits statement received in 2021; (e) AMEC's obligation to promptly pay retirement benefits to retirees upon request; and (f) AMEC's implied obligation to act in good faith in the performance of its contractual obligations.

## COUNT XI

Claim for Promissory or Equitable Estoppel
(In the Alternative to Counts I-X)
(Against Defendant AMEC)

165.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

166.    Plaintiff asserts a state law claim for promissory or equitable estoppel against Defendant AMEC to the extent that the Plan did not create an enforceable contractual relationship between AMEC and Plaintiff and the other Class members.

167.    As shown above, AMEC repeatedly promised and represented (a) to operate the Plan in accordance with ERISA; (b) to enroll all eligible employees in the Plan; (c) to make contributions pursuant to the Plan's terms, including contributing 12% of each employee's salary; (d) to fund Level III benefits for all Pastors and Presiding Elders from the Church's

General Treasury; and (e) and to invest the Plan's assets utilizing a conservative investment strategy.

168.    These promises and representations were clearly communicated to Plaintiff and the other Class members through AMEC's Plan documents and communications, including the summary plan description, quarterly benefit statements, the quadrennial General Conference, the quadrennial Doctrine and Discipline text that follows each General Conference, the Church's annual conference reports, and/or other generally distributed documents and oral assurances.

169.    AMEC expected or reasonably should have expected that Plaintiff and the other Class members would continue to work for AMEC in reliance, in whole or in part, on AMEC's promise and representation to follow the strictures of ERISA, including by paying and funding pension benefits, and prudently and loyally investing their retirement savings, in exchange for their completion of years of service.  A principal purpose of a pension is to encourage employees to continue working at their job instead of leaving and causing turnover.

170.    Plaintiff and the other Class members continued working at their jobs and earned their years of service for their pension benefits in reliance on the promises and representations made to them by AMEC.

171.    AMEC has repudiated these promises and representations by failing to operate an ERISA-compliant Plan, failing to enroll all eligible employees, failing to fund all Plan participants at the level promised and failing to invest Plan assets in a prudent and loyal manner.

172.    Because Plaintiff and the other Class members continued to work for the Church in reliance on AMEC promises, they forewent opportunities to seek other employment that would have paid them benefits, including retirement benefits.  Plaintiff and the Class can never undo those years spent working for AMEC and cannot reverse time to work for an employer that

will actually honor its promises and representations to pay pension benefits.  Accordingly, if AMEC does not honor its promises and representations to operate the Plan in compliance with ERISA and adequately fund and invest the promised pension benefits, Plaintiffs and the other Class members have relied on these promises and representations to a substantial detriment, as they will retire with far less income than they expected and will have been deprived of the opportunity to make up for that lost income.

173.    AMEC's promises and representations must be enforced to avoid this injustice to the Plaintiff and the other members of the Class.

## COUNT XII

### Claim for Violation of Tennessee Uniform Trust Code for
### Breach of Trust and Misappropriation of Trust Funds
### (In the Alternative to Counts I-IX)
### (Against all Defendants)

174.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

175.    The Plan's assets are held in trust.

176.    Plaintiff and the other Class members are beneficiaries of the Plan's trust.

177.    Defendant AMEC, in its role as the employer with respect to the Plan, is a fiduciary pursuant to the Plan's documents.

178.    The Council of Bishops, General Board, Department of Retirement Services, Defendants Bishop Green, Harris, the Trustees, and the Doe Defendants are trustees within the meaning of the state law of trusts.

179.    Pursuant to Tennessee state law, "a trustee shall take reasonable steps to take control and protect the trust property."  TN Code § 35-15-809.

180.    Tennessee state law follows the Uniform Prudent Investor Act, which is substantially similar to ERISA's duty of prudence owed to plan participants and beneficiaries. *See* TN Code §§ 35-14-103; 35-14-104.  The statute provides in relevant part:

> c.  A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution.
>
> d.  A trustee's investment and management decisions respecting individual assets must be evaluated not in isolation but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.
>
> e.  Among circumstances that a trustee may consider in investing and managing trust assets the following are relevant to the trust or its beneficiaries:
>
>> 1.  General economic conditions ….
>>
>>> (4) The role that each investment or course of action plays within the overall trust portfolio, which may include financial assets, interests in closely held enterprises, tangible and intangible personal property, and real property;
>>>
>>> (5) The expected total return from income and the appreciation of capital;
>>>
>>> (6) Other resources of the beneficiaries;
>>>
>>> (7) Needs for liquidity, regularity of income, and preservation or appreciation of capital.
>
> TN Code § 35-14-104.

181.    By investing more than two-thirds of the Plan's assets into highly risky, speculative, possibly fraudulent and demonstratively imprudent investments in Motorskill Venture Group and Florida real estate, Defendants violated the Tennessee Uniform Prudent Investor Act.

182.    Trustees also owe a duty of loyalty to trust beneficiaries, similar to that under ERISA.  *See* TN Code §§ 35-15-802 ("(a) A trustee shall administer the trust solely in the

interests of the beneficiaries. (b) …a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected the transaction").

183.    Defendants Department of Retirement Services, Bishop Green and the Trustees breached their duty of loyalty owed to Plaintiff and the Class under Tennessee state law through their complete abandonment of their fiduciary duties, failing to do anything as it relates to administration of the Plan, including the selection and monitoring of Plan investments and permitting a single fiduciary, Defendant Harris, to make all investment decisions for the Plan. This misconduct resulted in Defendant Harris's extraordinarily high-risk investments in the Motorskill Venture Group, Day and Night Solar and undeveloped real estate in Key Marco Island, Florida.

184.    In doing so, these Defendants failed to make Plan investment decisions based solely on the merits and what was in the interest of participants.  These Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their duty of loyalty under TN Code §§ 35-15-802(a).

185.    Further, Defendant Harris's investments of Plan assets in Motorskill Venture Group, the Florida real estate and Day and Night Solar (through the Plan's investment in Financial Freedom Fund, LLC) was made in order to benefit Defendant Harris.  Accordingly, this misconduct constitutes misappropriations of Plan assets (the trust's funds) of the highest order.  Defendant Harris's self-dealing violated TN Code §§ 35-15-802(b).

186.    As fiduciaries/trustees of the Plan, all Defendants have violated Tennessee Uniform Trust Code.  Plaintiff and the Class are entitled to restoration of the trust by Defendants in the amount of the Plan's June 30, 2021, valuation of $126,800,000.

## COUNT XIII

Alternative Claim for Violation of the Tennessee Wage Protection Act
(In the Alternative to Counts I-IX)
(Against Defendant AMEC)

187.    Plaintiff incorporates and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

188.    The Tennessee Wage Protection Act, TN Code § 50-2-113, *et seq*., provides civil protection from theft of wages and for the denial of fair compensation for work completed.

189.    The Tennessee Wage Protection Act defines "wages" to include all remuneration paid for personal services from whatever source.

190.    The Tennessee Wage Protection Act states that these "wages" include "employee salary reduction contributions to cash or deferred plans pursuant to §§ 401(k), 403(b), 457, compiled in 26 U.S.C. §§ 401(k), 403(b) and 457, respectively, or any similar plan contained in the Internal Revenue Code, employee salary reduction contributions to cafeteria plans pursuant to § 125 of the Internal Revenue Code, compiled in 26 U.S.C. § 125, and the cash value of all remuneration in any medium other than cash."

191.    Defendants' failure to promptly pay benefits to retirees constitutes wage theft under this law.

192.    Reduction in vested account balances through unilateral reduction of 70% of participant account balance likewise constitutes wage theft under the Tennessee Wage Protection Act.

193.    Any theft or embezzlement of money from the Plan resulting in loss of promised benefits to Plan participants also constitutes a violation of the Tennessee Wage Protection Act.

194.    Defendants have violated the Tennessee Wage Protection Act, TN Code § 50-2-113, *et seq*. and must restore all monies to the Plan lost as a result of Defendants' violation of the Act and promptly pay all retirees the pension benefits they have been promised.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, demands judgment against Defendants on each Count of the Complaint and the following relief:

1.    Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiff as the Class representative, and appoint his attorneys as Class Council to represent the members of the Class;

2.    Declare that the African Methodist Episcopal Church Ministerial Retirement Annuity Plan is an employee benefit pension plan governed by ERISA, that Rev. Alexander is an ERISA Plan participant, that Defendants are fiduciaries with respect to the Plan and that Defendants breached their fiduciary duties in failing to operate the Plan in compliance with ERISA, to prudently invest and monitor the Plan assets, and to oversee the other fiduciaries with respect to these activities;

3.    Declare that Defendant Harris engaged in prohibited transactions with respect to the Plan and its assets;

4.    Order Defendants to promptly pay Plaintiff and retired participants any and all benefits due;

5.    Order appropriate equitable and remedial relief to make the Plan whole for any and all losses sustained as a result of the Defendants' fiduciary breaches;

6.      Order an equitable accounting, at the Defendants' expense, of the Plan and its assets;

7.      Surcharge Defendants for any and all losses to the Plan and the participants as a result of Defendants' fiduciary breaches in failing to properly manage the Plan and its assets;

8.      Reform the Plan to bring the Plan into compliance with ERISA;

9.      Order that Defendants operate the Plan in compliance with ERISA, including by:

   a.   Requiring Defendants to invest the assets of the Plan in a prudent and loyal manner;

   b.   Requiring AMEC to enroll all employees pursuant to Plan terms, as described herein;

   c.   Requiring AMEC to make contributions pursuant to Plan terms, as described herein; and

   d.   Requiring Defendants to comply with ERISA's reporting and disclosure requirements, including sending pension benefit statements that comply with ERISA to Plan participants, filing Form 5500 reports, distributing ERISA-compliant summary plan descriptions and Summary Annual Reports;

10.     Pursuant to ERISA Section 502(c)(3), 29 U.S.C. § 1132(c)(3) and 29 C.F.R. § 2575.502c-3, find AMEC, as Plan administrator, liable to Plaintiff and the Class in the amount of $110 per day from the date of each separate failure to meet the disclosure requirements specified in ERISA Section 105(a), 29 U.S.C. § 1025(a);

11.     Order that Defendants disgorge and pay to the Plan's participants all revenues received and profits obtained from violations of ERISA;

12.    Order equitable restitution and other appropriate equitable monetary relief against Defendants;

13.    Order that Defendant AMEC be estopped from denying payment of the amount Plan account balances as represented on Plan participants' second quarter 2021 benefit statements;

14.    Order AMEC to immediately pay each plan participant such benefits as reflected in their account balances immediately before Defendants unilaterally reduced benefits by approximately 70%;

15.    To the extent necessary, order the creation of a constructive trust and order Defendants to pay into such trust all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the Plan and their participants and beneficiaries.  This includes, but is not limited to, the ill-gotten gains and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or other violations of ERISA, or in the alternative, state law breaches breach of contract, quasi-contract and trust and violations of the Tennessee Wage Protection Act;

16.    Order that Defendants be removed from their roles as fiduciaries for the Plan, and appoint an independent fiduciary to bring the Plan into compliance with ERISA or applicable state law and to manage the Plan and its assets in compliance with applicable law;

17.    Award all damages and relief available in law and equity according to proof at trial, including, without limitation, punitive damages as permitted under state law;

18.    Award pre-and post-judgment interest;

19.    Award attorneys' fees and costs pursuant to ERISA, 29 U.S.C. § 1132(g), the common fund doctrine, TN Code § 35-15-1004, and/or other applicable doctrine; and

20.     Award such other and further relief as the Court deems equitable and just.

Respectfully submitted.

Dated:  March 22, 2022                    By:     _____/s/_____
                                                  Elizbeth Hopkins
                                                  Scott M. Lempert (*pro hac vice* admission
                                                  forthcoming)
                                                  Susan L. Meter
                                                  KANTOR & KANTOR, LLP
                                                  19839 Nordhoff Street
                                                  Northridge, CA 91324
                                                  Telephone: 877-783-8686
                                                  Facsimile: 253-285-1849
                                                  ehopkins@kantorlaw.net
                                                  slempert@kantorlaw.net
                                                  smeter@kantorlaw.net
                                                  *Attorneys for Plaintiff,*
                                                  REVEREND CEDRIC V. ALEXANDER